**Charles J. BOIS and Catherine Bois, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 88–2418–Mc.**

United States District Court, D. Massachusetts.

Oct. 16, 1990.

Neil Sugarman, Sugarman and Sugarman, P.C., Boston, Mass., for plaintiffs.

Paul G. Levenson, Asst. U.S. Atty., Boston, Mass., for defendant.

## OPINION

McNAUGHT, District Judge.

Jurisdiction is based on the provisions of the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680. The plaintiff, Charles Bois, born January 3, 1932 (now age 58), was a patient at the Veterans Administration Medical Center. He is married to the plaintiff Catherine Bois and is the father of two adult children.

In the year 1979 he developed a cancerous lesion in the vicinity of the right pyriform sinus which was removed with laser surgery. He had radiation therapy thereafter. From that time through 1984 he was seen roughly on a monthly basis at the Veterans Administration clinic.

The critical period for the plaintiff (in this case) is the year 1985. He was a person particularly susceptible to cancer, since he smoked and drank before and after the 1979 surgery. Tobacco smoke is a carcinogen as all of the physicians testified. About five percent of patients in the situation of the plaintiff, after surgery, would probably develop a new cancer.

The pyriform sinus area is difficult to visualize. It is examined by mirror. Rigid telescope, flexible endoscopy, barium swallow, catscan and biopsy are methods used, in addition to mirror, in efforts to discover cancer in the area.

In the early months of 1985, the plaintiff complained of huskiness of voice and difficulty in swallowing. See page 1055 of the hospital record, which discloses such complaints. He told the doctors at the Veterans Administration clinic that he couldn't drink even water without pain. Through June, he said, he told the doctors his condition worsened. According to the record "his voice is unchanged" on March 5, 1985, when he was admitted for a colonoscopy.

The record in October of 1985 (page 1058) contains an entry to the effect that the patient denied hoarseness or ear pain, although the plaintiff insisted that by August and September even warm milk burned his throat, and he said he told the doctors so. Mr. Bois testified that a biopsy was done. The record indeed shows that it was taken (October 8, 1985). It shows also at page 1061 that in August of 1985 there was discomfort in his left neck associated with drinking orange juice in the morning. The December entries for that year show similar throat discomfort when swallowing. On December 24, 1986, a barium swallow was contemplated. Mr. Bois testified that

he did not stop coughing from February to December of 1985. Now, he became displeased with the Veterans Administration physicians and decided to go to the Massachusetts Eye and Ear Infirmary. He said that at the Veterans Administration his complaints were ignored; that different doctors saw him each time that he came to the clinic. I find that whether his complaints were or were not recorded completely, is a question which should be answered in his favor. The testimony of the plaintiff himself, although not overwhelmingly persuasive, was buttressed by certain of the record entries, as noted above. As an illustration of the difficulties encountered with the record, we note that on July 2, 1985, there was a record of pain on the left posterior tongue "the last six months".

Doctor Ira Kanfer, pathologist, in response to questioning from plaintiff's counsel, having been acquainted with the fact that in February of 1986 (on the 15th) a total laryngectomy was performed (pathological report of the Massachusetts General Hospital, Exhibit A) expressed the opinion, when a hypothetical was posed, that the lesion was in existence and should have been observable, in his opinion, in August of 1985; that cancer in situ was present during that month, and that the invasive carcinoma was there in the month of November. Dr. Parvis Janfaza of the Massachusetts Eye and Ear Infirmary, who examined Mr. Bois January 10, 1986, said that he studied the man and found ulceration of the left pyriform sinus whereupon endoscopy was done and eventually, the laryngectomy.

It was Dr. Janfaza's opinion that if the patient presented continuing complaints from February through December of 1985, and I find that he did, and if he had a persistent sore throat on December 10, 1985 (and I find that he did), the dysplastic lesion probably began to develop as early as January of 1985. He opined that in the proper exercise of medical practice, it should have been discovered by the Veterans Administration doctors by August of 1985. Then, said he, mirror exam, flexible endoscopy and barium swallow, catscan, direct inspection and biopsy should have been done with this high risk patient. Dr. Janfaza was of the opinion that under the circumstances, the cancerous lesion should have been discovered earlier by the Veterans Administration doctors, and that had it been, local excision could have been done, and that the total wide field laryngectomy would have been avoided. In other words, the laryngectomy could have been avoided, even if the diagnosis were made four months before, and it should have been.

The conclusion: There was medical negligence, causally related to the performance of the laryngectomy which could have been avoided.

The results: The larynx functions are gone. He cannot cough or speak as he could before. Air from outside the body goes directly to the lungs through the trachea without the protective functions of the cleaning and warming which had been performed by the nose. No longer, by reason of the surgery, can he make his chest sufficiently rigid to lift objects. He has a diminished life expectancy. He has a stoma through which he breathes.

He cannot speak through the mouth and has to employ a prosthesis in the stoma, a new one of which must be inserted each three days by his wife, due to his limited field of vision. With that prosthesis, he closes off the air entrance and its exit, and "speaks" through the mouth without vocal chords.

For a year, he couldn't speak at all. When his wife returned to work (after caring for him at home for eight weeks) he first communicated with her by telephone, by using tapping sounds as a signal.

Difficulty with the prosthesis is encountered frequently. Embarrassing episodes have occurred in public, where matter has escaped through the prosthesis and his wife has had to take charge of the situation.

Prior to 1986, this man was not without physical problems. He had a serious drinking problem, had mental and emotional problems, and a seizure. He hadn't worked since 1972. In fact, he was unable to work.

The laryngectomy has created another "crippling" difficulty for him and for his wife. The attitude of his two grandchildren—one of fright when with him—is just one of the elements of his mental "suffering".

The situation of his wife is also a difficult one. She has lost what companionship she did have, and is more now a nurse than a spousal companion. She suffers also.

It is regrettable that his own habits (drinking and smoking) figured in the appearance of the squamous carcinoma in 1985. He personally would have to admit responsibility for its appearance. On the other hand, the evidence discloses that it could have been excised locally. It was failure to diagnose the carcinoma early (which should have been done) which was causally related to the total laryngectomy.

The evaluation of damages in this case is very difficult. The defendant, United States, cannot be held responsible for anything except that which was causally related to the laryngectomy. This is not to lessen the awful physical situation in which the plaintiff finds himself. It is, however, to limit the damages to the portion for which the defendant is to be held liable. His physical difficulty will be with him the rest of his life. He has to live with the discomfort, the embarrassment, the disfigurement and the strained relations with his family. How long a life lies ahead we do not know, but he knows that his days have been shortened to some degree. That knowledge is also a part of his suffering.

Assuming that the usual three score and ten cannot be achieved by him, for the lesser number of years in which he shall live, I should assess and must assess a fair sum of money to compensate him for his pain and suffering. I can only call upon my recollection for awards for personal injury made by juries and judges, including myself, in the past. I travel in memory from the year 1951 to the present, and take all of those results into account in arriving at a fair result. A reasonable judgment, in my opinion, should be in the amount of $500,000 for Mr. Bois. Mrs. Bois, I conclude, should be awarded $50,000 for her loss of her husband's love, affection and companionship.

SO ORDERED.